**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| STOPLOSS SPECIALISTS, LLC,<br>STOPLOSS, LLC, | ) | Case No. _____ |
| | ) | |
| Plaintiffs, | ) | **COMPLAINT** |
| | ) | |
| vs. | ) | |
| | ) | |
| INSURED ADVOCACY GROUP, LLC,<br>INSURED ADVOCACY GROUP II, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiffs StopLoss Specialists, LLC ("Specialists") and StopLoss, LLC ("StopLoss," and together with Specialists, "Plaintiffs"), for their complaint against Insured Advocacy Group, LLC, and Insured Advocacy Group II, LLC (together, "Defendants"), allege as follows:

**NATURE OF THE ACTION**

1. Plaintiffs provide emergency response and property restoration services and have decades of experience doing this kind of work. Companies hire Plaintiffs when properties—primarily large, commercial buildings—sustain significant disaster-related damage.

2. Specialists and Defendants are parties to a First Party Claims Non-Recourse Sale and Assignment Agreement (the "Agreement"), dated August 16, 2023, whereby Defendants agreed to help finance certain of Plaintiffs' restoration projects. Specialists is a former member and part owner of StopLoss.

3. The Agreement is a type of "factoring" contract, which is a common arrangement in the construction industry whereby one company (here, Specialists) sells certain of its accounts receivable at a discount to another company (here, Defendants) in exchange for an advanced, upfront capital payment. The seller receives an immediate capital injection—typically, a

percentage of the total value of the account sold—while the buyer receives repayment via the purchased accounts over a longer period of time. Critical to this arrangement is the factoring buyer's prompt payment of funds.

4.      After executing the Agreement, Defendants encouraged Plaintiffs to seek out restoration projects with the promise of funding them. Defendants would even identify specific properties needing restoration and encourage Plaintiffs to procure the contract for the work. At all relevant times, Defendants assured Plaintiffs that Defendants would fund work on the projects if Plaintiffs secured the contract for the work. This assurance was important because, as Defendants knew, Plaintiffs depended on Defendants' financing to secure and complete the identified projects.

5.      This case involves Defendants' breach of the Agreement and a corresponding Purchase Addendum (the "Addendum"), dated December 13, 2024, under which Defendants committed to finance Plaintiffs' restoration work to the historic Renaissance Tower, a 56-story skyscraper in downtown Dallas, Texas.

6.      In early 2024, a weather event caused significant damage to the Renaissance Tower that required hundreds of millions of dollars in mitigation and restoration. Defendants introduced Plaintiffs to the project, encouraged Plaintiffs to procure a contract for work restoring the tower, and committed to financing the project if Plaintiffs could secure the contract.

7.      Relying on Defendants' representations and commitments, Specialists secured a Work Agreement (the "Work Agreement"), dated October 5, 2024, with GrayStreet Management Services, LLC ("GrayStreet") to mitigate the storm damage to the Renaissance Tower and restore the building. GrayStreet is the company that manages the Renaissance Tower and is also the insured on the property.

8.      Plaintiffs provided the Work Agreement to Defendants, along with other substantial due diligence information, for Defendants to evaluate and finance the project. After conducting their own valuation, Defendants themselves estimated that the total cost and funding for the project would exceed $400 million.

9.      Pursuant to the executed Addendum, Defendants promised a minimum of $5,169,519.79 to fund just the beginning of work on the Renaissance Tower project. Both before and after executing the Addendum, Defendants repeatedly promised Plaintiffs that Defendants would fund Plaintiffs' work on the project and that Defendants would abide by the terms of the Agreement and Addendum.

10.     Relying on Defendants' promises, Plaintiffs dedicated tens of millions of dollars' worth of work, and incurred millions of dollars in hard costs, to mitigating the damage to the Renaissance Tower.

11.     Despite their assurances and signed agreements, Defendants never made a single payment to Plaintiffs toward the Renaissance Tower project. Despite Plaintiffs' repeated requests for Defendants to comply with their funding obligations, Defendants refused to perform.

12.     Defendants' breach forced Plaintiffs to explore financing from alternative sources to be able to continue work on the Renaissance Tower project. However, even when Plaintiffs identified an alternative source, Defendants interfered with Plaintiffs' securing that financing.

13.     Because Plaintiffs were dependent on Defendants' funding, Defendants' breach—and subsequent actions that prevented Plaintiffs from securing alternative funding—forced Plaintiffs to cease work on the Renaissance Tower, leading to Plaintiffs' loss of the project.

14.     As a result of Defendants' breach of the Agreement and Addendum and Plaintiffs' loss of the Renaissance Tower project, Plaintiffs' financial position worsened to the point that on

3

March 5, 2026, Plaintiffs filed for bankruptcy under chapter 11 of title 11 of the United States Code.

15.     Plaintiffs bring this action to recover the damages that they have suffered to date and continue to suffer due to Defendants' breach of the Agreement and Addendum and intentional and willful misconduct.

## THE PARTIES

16.     Specialists is a Georgia limited liability company.

17.     StopLoss is a Louisiana limited liability company.

18.     Defendant Insured Advocacy Group, LLC ("IAG"), is a Texas limited liability company.

19.     Defendant Insured Advocacy Group II, LLC ("IAG II") is a Texas limited liability company.

## JURISDICTION AND VENUE

20.     This proceeding relates to Plaintiffs' chapter 11 bankruptcy cases, pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division under the captions *In re StopLoss Specialists, LLC*, No. 26-90387 (S.D. Tex Mar. 5, 2026), and *In re StopLoss, LLC*, No. 26-90388 (S.D. Tex. Mar. 5, 2026), both of which are jointly administered under *TM36, LLC*, No. 26-90386 (S.D. Tex. Mar. 5, 2026).

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1334(b), which states that federal district courts have "original jurisdiction over all civil proceedings . . . arising in or related to cases under title 11." This case is "related to" a title 11 case—namely, Plaintiffs' bankruptcy cases—because its "outcome might have a[] 'conceivable effect' on the bankrupt estate." *Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011) (quoting *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir.1992)); *see also*

4

1 Collier on Bankruptcy ¶ 3.01 (16th 2026) (noting that "[c]ivil proceedings encompassed by section 1334(b)'s 'related proceedings,' that is, those whose outcome could conceivably have an effect on the bankruptcy estate," include "causes of action owned by the debtor that became property of a title 11 estate").

22.     This proceeding has been referred to the Court pursuant to 28 U.S.C. § 157(a) and General Order 2012-6, *In re: Order of Reference to Bankruptcy Judges* (S.D. Tex. May 24, 2012). The parties have agreed not to withdraw the reference. *See* Letter Regarding Agreement to Venue in United States Bankruptcy Court for the Southern District of Texas, Houston Division, *StopLoss Specialists, LLC v. Insured Advocacy Group et al.*, Case No. 25-cv-6339 (S.D.N.Y. Mar. 11, 2026), ECF No. 75.

23.     This proceeding is not a core proceeding but is otherwise related to a case under title 11. 28 U.S.C. § 157(c). Plaintiffs consent to entry of a final order or judgment by the Bankruptcy Court, as have Defendants. *See* Letter Regarding Agreement to Venue in United States Bankruptcy Court for the Southern District of Texas, Houston Division, *StopLoss Specialists, LLC v. Insured Advocacy Group et al.*, Case No. 25-cv-6339 (S.D.N.Y. Mar. 11, 2026), ECF No. 75.

24.     This Court has personal jurisdiction over Defendants because they are at home in Texas.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1409(a). Defendants have further agreed that venue is proper in this Court. *See* Letter Regarding Agreement to Venue in United States Bankruptcy Court for the Southern District of Texas, Houston Division, *StopLoss Specialists, LLC v. Insured Advocacy Group et al.*, Case No. 25-cv-6339 (S.D.N.Y. Mar. 11, 2026), ECF No. 75.

**FACTUAL BACKGROUND**

A.   <u>**Specialists' Factoring Agreement with Defendants**</u>

26.   Plaintiffs have decades of experience in emergency property mitigation, remediation, and restoration services. Notable examples of the decades of property-restoration experience that Plaintiffs have been involved in include the Grand Isle Towers condominiums in Punta Gorda, Florida; the Carlstar Tire Plant in Franklin, Tennessee; and other similar projects across the Southeastern United States.

27.   Given the size of the projects Plaintiffs often take on, a large upfront investment is usually required for Plaintiffs to meet initial payments for equipment and to subcontractors. Defendants learned about Plaintiffs and were interested in investing in Plaintiffs' projects to help with initial costs in exchange for the longer-term—but significantly higher—rate of return on Plaintiffs' accounts receivable for a project. Accordingly, in 2023, Specialists and Defendants entered into such a factoring arrangement with an effective date of August 16, 2023. A copy of the Agreement is attached to this complaint as Exhibit 1.

28.   The Agreement sets out a framework under which Specialists would sell—and Defendants would purchase—future accounts or account balances from Specialists through project-specific purchase addenda.

29.   The Agreement includes a choice-of-law provision selecting Texas law. The parties further agreed to waive their rights to a jury trial of any claim or cause of action arising under or related to the Agreement.

30.   Since August 16, 2023, Defendants have purchased accounts from Specialists pursuant to the Agreement by entering into various purchase addenda. Each purchase addendum is applicable to the specific account(s) that Defendants agreed to purchase and that Specialists

6

agreed to sell. Per the Agreement, Defendants were required to pay the Purchase Price[1] applicable

for each account purchased on the Closing Date for each addendum.

> 2.3.2 Upon the full execution of the Master Purchase Agreement, Buyer shall pay to Seller on or before 5:00 p.m. (EST) on the Closing Date the Purchase Price for the Selected Accounts purchased by Buyer. The Purchase Price shall be paid to Seller in immediately available funds in United States Dollars by wire transfer in accordance with the Wire Transfer Instructions.

31.     After entering into the Agreement, it was Defendants' practice to identify potential restoration projects for Plaintiffs and to encourage Plaintiffs to procure a contract for that work. Defendants would promise funding to Plaintiffs for each potential project and would oftentimes even put Plaintiffs directly in contact with the property. Plaintiffs relied on Defendants' financing commitments to then try to procure the potential new project.

32.     In the months leading up to the Renaissance Tower project and consistent with what became their practice, Specialists and Defendants executed various, project-specific purchase addenda related to other projects that Defendants encouraged Plaintiffs to take on and that Defendants agreed to finance. Given the time-sensitive nature of emergency property mitigation, remediation, and restoration services, Plaintiffs would often immediately begin the work needed to mitigate the damage suffered by the affected property, while keeping Defendants apprised of the progress. At Defendants' request, Plaintiffs even created a commercial pipeline spreadsheet

---

[1] Unless otherwise noted, capitalized terms in this complaint have the same meaning as defined in the Agreement.

that Plaintiffs shared with Defendants and updated weekly. The spreadsheet provided updates on the status of the projects that Defendants encouraged Plaintiffs to procure and offered to finance.

33. At the same time as Plaintiffs would share updates, Defendants would complete their due diligence to finalize financing for each project, including investigating the insurance coverage on the property, potential liens held against the property, and any other issues that may present a collectability issue for the purchased account. Specialists and Defendants would then execute a purchase addendum for that specific project that memorialized Defendants' promised financing for all of Plaintiffs' invoices on the respective project.

34. Since Defendants conducted due diligence related to their financing of each project, the Agreement provided that, with limited exceptions, "Buyer's purchase of the Selected Accounts shall be without recourse and Buyer assumes the risk of partial or complete non-collectability of any Selected Account."

### B. The Renaissance Tower Project

35. The Renaissance Tower is a high-rise office building located at 1201 Elm Street in Dallas, Texas. The Renaissance Tower has been a major landmark of downtown Dallas since its construction in 1974, and it was the tallest building in Dallas until 1985. Today, it is still the second tallest building in Dallas and the fifth tallest in Texas.

36. In early 2024, a weather event caused damage to the Renaissance Tower that required immediate mitigation and significant repairs to the building.

37. By no later than July 2024, Defendants had identified the Renaissance Tower restoration work as a potential project for Plaintiffs; facilitated the introduction of Plaintiffs and GrayStreet, the company that manages the Renaissance Tower; encouraged Plaintiffs to procure a contract for the project; and promised Plaintiffs and GrayStreet that Defendants would finance the project. By September 2024, Plaintiffs had added the Renaissance Tower project to the commercial

pipeline spreadsheet that Plaintiffs shared with Defendants and had even given it a project number. It was the thirteenth project on the list.

38.     Specialists eventually entered into an agreement with GrayStreet to perform mitigation and restoration work on the Renaissance Tower—the Work Agreement, which is dated October 5, 2024.

39.     After execution of the Work Agreement, Plaintiffs promptly sent it to Defendants and began work on the Renaissance Tower. Plaintiffs would provide updates to Defendants of the work that was being done on the project, consistent with past practice. Plaintiffs further provided Defendants with weekly updates of all invoices sent to and approved by GrayStreet for work on the project.

40.     As Plaintiffs got to work, they also kept Defendants apprised of the anticipated costs and financing required for the Renaissance Tower project. For example, Plaintiffs submitted an estimate to Defendants whereby Plaintiffs estimated that the project would have four phases, and that it would cost at least $96 million to complete Plaintiffs' anticipated repairs for just the first phase. Plaintiffs estimated that the entire project would cost around $400 million.

41.     After receiving Plaintiffs' estimate, Defendants' internal adjuster reviewed and increased the cost estimate to $98,727,698 for phase one, alone, and to over $400 million for the entire four-phase project. Plaintiffs understood that Defendants intended to fund Plaintiffs' work for all four phases of the project, hence the valuation.

42.     During this due diligence and valuation process, Defendants made repeated representations to Plaintiffs that Defendants intended to fund the Renaissance Tower project. Indeed, it was Defendants who introduced the project to Plaintiffs, and Plaintiffs kept Defendants apprised of developments throughout their work. Eventually, as was the parties' expectation and

9

practice, Defendants prepared a purchase addendum that memorialized the estimated size of the project and the Purchase Price for the first set of Renaissance Tower invoices Defendants would purchase.

43.     In the Addendum, dated December 13, 2024, Defendants agreed in writing to finance Plaintiffs' Renaissance Tower project. A copy of the Addendum is attached to this complaint as Exhibit 2.

44.     The Addendum memorialized the Purchase Price of invoices for just the initial work on the project at $5,169,519.79. The parties also memorialized the anticipated $98,727,698 cost of phase one of the project and the building's $500 million insurance policy limit, which was notably above the parties' estimated at least $400 million cost for the project.

| Total Estimated Damages (Phase 1) | $ 98,727,698 | The total estimated value to repair, replace or restore an insured property |
| Policy Limit: | $ 500,000,000 | The maximum amount the insurance company will pay out under the policy for the covered loss or claim. |
| Adjusted Portfolio Amount | N/A | The portfolio amount as reduced by adjustment. |
| Maximum Funding: | N/A | of the Adjusted Portfolio Amount |
| Draw 1 Portfolio: | $ 8,090,356.82 | Portfolio submitted for funding. |
| Draw 1 Adjusted Face Value (AFV): | $ 7,953,107.37 | Draw 1 Portfolio as reduced by adjustments. |
| Draw 1/Purchase Price: | $ 5,169,519.79 | 65% of Draw 1 AFV |
| Factor Fee: | 20% | Of Draw 1 AFV. |

45.     Based on Defendants' representations to Plaintiffs and Defendants' commitments and financing obligations per the Agreement and Addendum, Plaintiffs invested time, labor, and resources into providing mitigation services to the Renaissance Tower. In total, Plaintiffs

performed tens of millions of dollars' worth of mitigation work to the Renaissance Tower before ultimately stopping work on the project and the termination of its agreement with GrayStreet.

**C.      Defendants' Breach Caused Significant Damage to Plaintiffs**

46.      Defendants have not paid Plaintiffs any amount at all toward the Renaissance Tower project.

47.      Because of Defendants' failure to perform its obligations under the Agreement and Addendum and to adhere to its promises to finance the Renaissance Tower project, Plaintiffs were forced to cease all mitigation and restoration work on the Renaissance Tower. The Work Agreement permitted GrayStreet to terminate the contract if Specialists "fails to perform" its obligations under the agreement.

48.      Given Defendants' failure to pay Plaintiffs any funds toward the Renaissance Tower project, Specialists attempted to secure financing from another party to salvage the project and its contract with GrayStreet.

49.      Plaintiffs notified Defendants that they were attempting to secure financing from another party to save the project. After receiving notice from Plaintiffs, Defendants at first indicated that they would not oppose any attempts by Plaintiffs to enter into an alternative financing arrangement for the Renaissance Tower project.

50.      Relying on Defendants' representations that they would not oppose or interfere with any alternative financing arrangement, Specialists executed a signed term sheet with the alternative financing source. Plaintiffs fully anticipated that the alternative funder would fund the project. But after learning of Specialists' signed term sheet, Defendants took actions to prevent Plaintiffs from securing this alternative financing. As just one example, after Specialists signed its term sheet with the alternative funder, Defendants told both Plaintiffs and the alternative funder that Defendants

11

intended to substantively perform its obligations under the Agreement and Addendum and fund the project so that work could restart on the Renaissance Tower.

51. After Defendants' representations, the alternative funder pulled out of negotiations with Plaintiffs. Despite Defendants' representations, Defendants never paid Plaintiffs any amount toward the Renaissance Tower project.

52. Defendants' actions left Plaintiffs unable to secure financing that could have enabled Plaintiffs to resume work on the Renaissance Tower in a timely manner.

53. In June 2025, GrayStreet terminated its Work Agreement with Specialists due to Defendants' failure to fund the Renaissance Tower project. The termination agreement specifically identified the failure of Defendants, both of which were included in the definition of "Schroders," to fund the project as the basis for GrayStreet's termination of the Work Agreement.

> C. Schroders (as that term is defined below) represented to GrayStreet and StopLoss that it would provide financing for the Property. Schroders was expected to advance funds on an interim basis sufficient to pay StopLoss's invoices.
>
> D. Schroder failed to fund the financing and purchase addendum executed between StopLoss and Schroder, such failure and refusal to fund has created unanticipated substantial cash burden on StopLoss and created unanticipated substantial cash requirements for GrayStreet.

54. Defendants' breach of the Agreement and Addendum caused Plaintiffs to lose out on Plaintiffs' anticipated profits from their work on the Renaissance Tower project.

55. Because of Defendants' commitments—including the signed Agreement and Addendum—Plaintiffs dedicated time, labor, and resources toward the Renaissance Tower project that they otherwise could have dedicated to other projects. As Defendants knew, Plaintiffs were dependent on their financing. Defendants' breach of its representations to Plaintiffs, and of the promises made in the Agreement and Addendum, caused Plaintiffs to lose out on not just the Renaissance Tower project, but also on other projects, including those about which Defendants were aware given the parties' shared commercial pipeline spreadsheet and conversations.

56.     Plaintiffs' loss of these projects contributed significantly to Plaintiffs' need to file for bankruptcy, which Plaintiffs did in the United States Bankruptcy Court for the Southern District of Texas on March 5, 2026.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

57.     Plaintiffs incorporate each of the allegations of this complaint as if set forth fully herein.

58.     The Agreement and Addendum are binding and enforceable contracts between Specialists and Defendants. The terms of the Agreement and Addendum are sufficiently certain for the Court to enforce.

59.     At all relevant times, Plaintiffs performed all conditions, covenants, and promises required of them in accordance with the terms of the Agreement and Addendum or were otherwise excused from performance.

60.     Defendants have materially and willfully breached the Agreement and Addendum—including by breaching the implied covenant of good faith and fair dealing—by, *inter alia*:

(a)     failing to pay Plaintiffs the $5,169,519.79 required Purchase Price; and

(b)     failing to pay Plaintiffs any sums related to Defendants' agreement to finance the Renaissance Tower project.

61.     Defendants' actions constitute willful misconduct.

62.     Defendants' material and willful breach of the Agreement and Addendum proximately caused injuries to Plaintiffs in an amount to be proven at trial, including actual damages and lost profits.

## SECOND CLAIM FOR RELIEF

### (Tortious Interference with Contract)

63.     Plaintiffs incorporate each of the allegations of this complaint as if set forth fully herein.

64.     Specialists had a valid contract with GrayStreet related to Specialists' restoration work for the Renaissance Tower.

65.     Defendants had knowledge of Specialists' contract with GrayStreet and knew that Plaintiffs would use Defendants' financing for work related to Specialists' contract with GrayStreet.

66.     Defendants willfully and intentionally interfered with Specialists' contract with GrayStreet by, *inter alia:*

       (a)     failing to pay Plaintiffs any sums related to Defendants' agreement to finance the Renaissance Tower project; and

       (b)     taking actions that prevented Plaintiffs from securing financing from an alternative source to salvage the Renaissance Tower project.

67.     Defendants' actions proximately caused injuries to Plaintiffs, including resulting in actual damages and lost profits, including profits from Specialists' contract with GrayStreet.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

a.     awarding Plaintiffs damages, restitution, disgorgement, and all other relief permitted by law or equity;

b.     awarding Plaintiffs pre-judgement and post-judgment interest, as well as attorneys' fees and costs, and all other relief as set forth above; and

c.    awarding Plaintiffs such other relief as the Court may deem just and proper under the circumstances.

Dated: March 12, 2026                    Respectfully submitted,

By: */s/ Vineet Bhatia*
Vineet Bhatia
Krisina Zuñiga
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone (713) 651-9366
Facsimile (713) 654-6666
vbhatia@susmangodfrey.com
kzuniga@susmangodfrey.com

Lear Jiang (admission forthcoming)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone (310) 789-3100
Facsimile (310) 789-3150
ljiang@susmangodfrey.com

Abigail Flanigan (admission forthcoming)
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone (212) 336-8330
Facsimile (212) 336-8340
aflanigan@susmangodfrey.com

15